All right. Good afternoon. Welcome to the Ninth Circuit. We have one case on the argument calendar today, Clark v. Broomfield, and my understanding is that all three counsel are going to be participating via Zoom. So let me make sure, first, Mr., is it Carl? It's Carol. Carol. And so you can hear us? Yes, Your Honor. All right. And your co-counsel is Mr. Magnuson? That's correct. Okay. And Mr. Gutman, you're there as well? Yes. All right. So my understanding, Mr. Carol, is that you and Mr. Magnuson are splitting your 30 minutes, 15 each. Is that right? That's correct, Your Honor. We would like to reserve five minutes for rebuttal. All right. And you'll be doing the rebuttal? It depends. I'm focusing on the AEDPA issue. Mr. Magnuson is addressing the FRERETA issue. So if you don't even have any questions on that, or there are a few, I don't have to take the full 15 minutes. All right. Well, let's just see how it goes. And whenever you're ready. Thank you. Ready. Good afternoon, Your Honors. My name is Jack Carol. And I, along with my co-counsel, Michael Magnuson, represent the habeas corpus petitioner and appellant, Douglas Clark. Mr. Magnuson and I will be splitting our time as we just discussed. And I will be addressing the AEDPA issues. Mr. Magnuson will address the FRERETA issues. So, appellant, Mr. Clark contends that the district court committed error when it ruled in 2016 that the AEDPA retroactively applied to Mr. Clark's habeas petition. This question is determined by two U.S. Supreme Court cases. One is Garceau v. Woodford, which talks about the situation in which the pre-AEDPA law will apply under the circumstances. And the second case is Estelle v. Gamble, in which the United States Supreme Court set down rules as to how a federal court must treat allegations made in pro per by unrepresented party. In this case, particularly a criminal defendant without representation seeking to enforce a remedial statute, which 2254 is. So, Estelle held that allegations made by self-represented defendant before the effective date of the AEDPA, which is April of 1996, will invoke pre-AEDPA law if the allegations seek habeas merits relief on the claims. In this case, in 1992, three and a half years before the effective date of the AEDPA, the petitioner filed a pro per document, actually lodged the document. It was later filed entitled writ of habeas corpus from a state capital trial and appellate process. Of course, the title of the document doesn't control, right? The title does not control, but the title shows what the pro per intended the document to be, or at least is a reasonable indication. But he did not, correct me if I'm wrong, but he did not seek an adjudication on the merits of any of the claims he listed in that document. I would disagree with that, your honor. The only thing he asked for was for counsel to be appointed to investigate the claims. He asked for post haste, quote unquote, relief on his FRERTA claim so that the case doesn't gum up the federal docket. You know, counsel, I mean, I have trouble reading this in a way other than I think Judge Thomas is reading it. And I'm looking at the bottom, for example, of ER 531, where he says, due to the extremely complex nature of capital case work, in this particular case's lack of urgency, this court to select one trial counsel to investigate and prepare the three compatible defenses the drunk trial counsel refused to investigate. So, I mean, it strikes me that he's asking for help from the court to appoint someone who will raise the habeas claims he wants to have appearing in pro per. Because there are other allegations in the petition which refer to the claim of the FRERTA misconduct and the claim of ineffective assistance in trial counsel and appellate counsel, which are specifically raised and specifically referred to as requiring post haste relief. There's also an issue as to whether you can even get counsel without having a petition for habeas corpus on file. That's mentioned in our reply brief. Certain circuits had ruled that it was not allowed. You couldn't get counsel until you filed a petition. Under Estelle, if the allegations about FRERTA and the IAC claims are to be construed as not being a petition, then there has to be some kind of reasonable interpretation as to why that is not applied. Why is that not a reasonable interpretation of the language of the 1992 application? If it's unreasonable, then that's fine. But it seems to be a reasonable way to do it. And if you look at Garceau, Garceau doesn't say it has to be a petition. All Garceau says is, is there a request for merits relief? It doesn't say it has to be full-blown. It doesn't say there has to be a prayer for relief. It says it just needs to seek merits relief. I don't see how you can look at the FRERTA allegations as anything other than seeking merits relief. I think you can look at them as laying out, here's all the bad stuff that happened and this is why I need a lawyer. I need a lawyer who's not a drunk, who is going to really assert my interests, not the things your client was claiming Mr. Keith was doing. If that is the court's consideration of the primary reason for this petition, it still doesn't matter because the holding of Garceau is whether the application contains a request for merits relief. I don't think you can read the FRERTA provisions in that without seeing that it's asking for relief post haste to avoid clogging the court's docket. Doesn't Garceau tell us that in looking at this, we can look at rule two of the rules governing 2254 cases with the five things that are in rule two? I don't recall that being in Garceau. I recall that being in the district court's 2016 order. All right, but isn't that something that we can look at? Well, not rule two, certainly not. Rule two doesn't, we're not looking at this as a demur. No, but I mean, can't we look at whether he specified all the grounds for relief, whether he stated the facts for each ground, whether he stated the relief requested, and whether it's signed under penalty of perjury? Aren't those factors we can look at? You can look at the factors, but it doesn't change the fact that he's seeking merits relief. It doesn't change the fact that the language exists. And if in some way, this pro per petition is inadequate, that doesn't mean it doesn't exist. Then it would have to be, if it is, then you would say, okay, if we were back in court, this doesn't quite make it as a petition, Mr. Clark, I'll give you leave to amend or else I'm dismissing it. You don't just look at the initial document and say, oh, that's not a petition because it doesn't comply with rule two. It is a pleading on file that seeks merits relief. It doesn't have to be a petition. That's what Justice O'Connor's dissent was all about, or not a concurrence. She said, I would have gone along with this case if you said you had to file a petition, but you're not going there. You're setting a rule that it has to be something less than a petition. Well, I don't like that. And by the way, you're not following your own rules. Majority. So it doesn't have to meet all of the four corners of a valid petition, and certainly it's not fair to look at it this far afterwards without any leave to amend, without any right in saying, ah, I think that's a demurrable petition. It doesn't exist. That's not what Garceau says. It says, was there something before the court that seeks merits relief? Is it an actual application for habeas relief as opposed to something else? Is it an application? No. An application that contains a request for merits relief, not an actual application. We're not here to talk about whether a document that might be inartfully pleaded doesn't really exist. It's an application. It's an attempt by him to make an application. We're not going to do a demurra 20 years later. Does it say this? It made it. It conforms with Garceau. It contains the magic words that Garceau needs. If you want to say this isn't an application, of course it's an application. It's seeking something. Well, the only thing he asked for is appointment of counsel. Where did he? If he asked for appointment of counsel, he asked for merits relief, too, because that's exactly what was at issue in Garceau. No, that's what was issue in footnote one of Garceau. Footnote one dealt with the statement of non-counsel. Counsel, please, I know we're a little difficult with Zoom, but please don't interrupt the people who are asking you questions. Oh, I'm sorry. Garceau, he moved for appointment of counsel, and he asked for a say of execution. Here, they really sought, although listing why he wants the relief, the bottom line is he asked the court to select trial counsel. And that would be inconsistent with asking for merits relief? Is that what? No, what I'm saying is that's exactly what happened in Garceau. It's not exactly what happened in Garceau, Your Honor, if I could disagree. Garceau, we're talking about footnote one in Garceau. That's where the issue came up, when the majority addresses the concurrence and talks about this document called the SNFI, we called it, the Statement of Non-Frivolous Issues, which was an Eastern District of California form, which specifically says these are issues that might, may be raised completely conditional. So, that clearly doesn't constitute, that would not qualify. It's not clear what the document did say. It's not a part of the record. To extrapolate from footnote one. Well, no, I was on Garceau. I saw the document. You did? Yes. Okay. I don't know. I don't see much difference between Garceau in this case. Because in Garceau, there was no document that sought habeas relief on the merits. The SNFI did not do so. The motions did not do so. Here we have a document called Petition, which seeks relief on the merits. If that is not a reasonable interpretation, that should be explained, why it's not reasonable that Clark could seek relief on the merits and at the same time, seek a lawyer. Doesn't seem internally inconsistent. You can do both. You don't need to get merits relief immediately. You can say, I want merits relief, and can you give me a lawyer who can probably put together a little better than I put it here? It seems a reasonable interpretation. If it's a pro per pleading, that has to be given deference. And Garceau was improper too. No, it wasn't. It was the attorney. Garceau was not proper. Later. Well, in terms of the documents that were being reviewed by the Supreme Court, those were from an attorney. Okay. Counsel, did you want to reserve the remainder of your time? Yes, I'd like to reserve. Well, right now, I'd like to turn it over to my co-counsel, Michael Magnuson. Thank you very much. Aha. Okay. Good afternoon, all. My name is Michael Magnuson, as you know. I'm going to try to address the Feretta issues. And I would note initially, if a criminal defendant has a constitutional right to self-representation, and if Feretta exists as a 40-year-old precedent and a manifestation of that right to self-representation, and if that right does exist for all criminal defendants, even those charged and convicted ultimately of despicable crimes, then Mr. Clark is entitled to a new trial. Unfortunately, the state trial court and sadly, the California Supreme Court distorted the factual record in order to avoid the actual consequences of the Feretta decision. And we're going to be asking and are asking this court to take a stand for Feretta and for the discussed by the California Supreme Court, two instances or three instances of that we believe Feretta was violated. I'm going to focus on two of them because of the sort of short time period we're dealing with here. But the first one is Mr. Clark's August 1982 request. Both August 13th and August 20th, in which the California Supreme Court ruled that this, and the trial court, this request was untimely. And even though the August 20th date was 18 days before trial. So counsel, I think I'm reading from the August 20th transcript and I'm at SCR 154, where your client says, I've declared a conflict of interest with Mr. Keith. I don't know what that status cast Ms. Watson into. I am satisfied with her representation of me. So how is this an unequivocal request by Mr. Clark that he represent himself with no, lawyers? And again, I believe this is August 20th. The August 20th, well, I don't have that portion of the record in front of me. The portion that I have is, let me put this in context. August 20th was the first day the case was sent to Judge Torres, who ultimately tried the case. The August 13th the Master Calendar Court, which of course was not going to try the case and the Master Calendar Court sent it to Judge Torres. And the first day Judge Torres saw the case at all was August 20th. And I'm looking at a portion of the transcript from August 20th. And I don't, this is, it looks like pages 601, 604, and then several following pages of the record in which Mr. Clark says, the exchange is Mr. Keith says, Mr. Clark is in effect orally making a Faretta motion and goes on a little bit. The co-counsel, Ms. Watson is asked about what is going on. And she indicates that she's not going to remain as co-counsel. If Clark is representing himself, and the prosecutor says we are not in a position, we're not in a posture of being ready to proceed to trial. And then the judge says, this case has been transferred for trial today. The court rules as follows. Your motion to go in pro per, if that is your motion is not timely. No discussion of whether it was equivocal. And it goes on to say your request to go pro per is not timely and is denied. Although the California Supreme Court found that it was equivocal, right? The California Supreme Court limited its analysis to it being timely. The district court... Well, I guess there are multiple supposed Faretta requests. Yeah, there are multiple requests. And what I'm looking at is where the California Supreme Court says, and I'm going to refer to the ER page 196, contrary to defendant's contention on July 26th, he did not unequivocally assert his right to self-representation. At most, he was annoyed at Keith's failure to completely win a defense discovery motion. So there certainly are places where for some of what was going on, the California Supreme Court found that at least some of the and at least one of the requests in the California Supreme Court's view was untimely. Yeah, you're correct. The July 26th request for Faretta... Mr. Clark made requests throughout the pre-trial period. But July 26th, the California Supreme Court found that it was equivocal. And frankly, I don't think the record shows that, but I'm not focusing on that today. I'm focusing more on the August motion in which the California Supreme Court did not rule on the question of whether it was equivocal or not, and neither did the trial court. The district court did seem to indicate that that request may have been equivocal as well as well. The record shows what it shows. The August request, there's no indication of equivocation. Well, but counsel, I apologize for repeating myself, but I read you part of the August 20 transcript at SCR 155, where your client says, and I quote, I am satisfied with her, meaning Ms. Watson's representation of me. And he goes on there. So it strikes me from my read of August 20 that what he's saying to the judge, I don't think there's any question he doesn't like the representation he's getting from Mr. Keith, but on multiple occasions, he talks about he's satisfied with Ms. Watson. And I have trouble finding a place where he unequivocally says to the judge, I want to get rid of both Mr. Keith and Ms. Watson and completely represent myself with no backup counsel where the court denied that. It's true that in different contexts, Mr. Clark sought to have representation as his co-counsel. And this does not preclude, this does not create a situation in which it is equivocal. Mr. Clark wants to represent himself, and he would like to have Ms. Watson represent him, but she declined. She was not willing to represent him. And therefore, he said that he would proceed pro per representing himself with no assistance of counsel. And that took place in the August 92 hearing. And nobody looking at that, I mean, the trial court or the California Supreme Court thought that was equivocal. I see I'm running short of time, I want to turn it with the okay with the panel to the question of Mr. Clark requesting or announcing that he was going to go mute through the rest of the trial. This is in the course of his self-representation. November 1, I believe it was 1982, he had been examining witnesses and had an adverse ruling by the trial court and decided that he would stand mute. So counsel, let me pose a hypothetical to you. Let's assume we have a circumstance where a defendant is scheming to create reversible error and actually says to the judge, you know, your honor, I just want to make this record as muddy as I can, so I'm going to stand mute here to create an appellate issue. And if you grant my right, I'll tell the appellate court you to proceed and have due process of law. And if you deny it, I'll say you denied me my right to represent myself. So let's say a defendant says all that and then finishes, but I want to stand mute. In that kind of a circumstance, is the court have to go along and say, okay, fine? No, I don't think so. The court can decide that this is a disruptive, that the defendant is just using this as a scheme to disrupt the trial and use its discretion to deny that kind of violation. So if we were going to apply EDPA deference, why wouldn't we apply it to the California Supreme Court's note statement? We noted the outset that any dispassionate reading of this record reflects that this defendant was playing games with the court on this issue. Indeed, defendant once implied in a letter to Bundy that he was attempting to manufacture reversible error as explained below. He has not succeeded. So why isn't that entitled? If we're going to apply EDPA deference, why wouldn't that be the equivalent of what you just said? Because when we look at the record in which that issue arose, it was not based on any disruptive conduct on Mr. Clark's part. In fact, it had been several weeks before there was any issue that has been identified. When Mr. Clark said, I have a right to stand mute if you rescind my pro per status, anything said or anything done is a violation of my right under the Sixth Amendment, which is, as I recall, applies in this courtroom whether you know it or not, saying that to the judge. That's not disruptive? I do not believe that is disruptive. That's an accurate statement of the law and the principle involved in that invocation of the right to stand mute and conduct your own defense in your own way. There's no doubt that Mr. Clark was disruptive at various points in the trial and pretrial proceedings, but he was not being disruptive at this point. And by the way, it's hard to imagine that standing mute is going to be a disruptive, is going to cause disruption. By definition, he's not saying anything. The court, the case should go much more smoothly as a result of that approach to conducting his own defense. So correct me if I'm wrong. I want to make sure I have the facts correct here. But on November 1, after the court basically said his motions were frivolous, then he says he's going to stand mute. And then the trial court revoked his improper status, and then it restored it the next day. Correct? Yes. So how long is this period of time you're referring to? Half a day? Right. But restoring his proper status was contingent upon his not standing mute. Yeah. So it was a half a day in which his right to self-representation was revoked or less. Correct? Ultimately, that is true. Okay. Thank you. All right. So counsel, you're basically out of time. I'm going to let you make a final statement now, and then I will give, and you can choose how you want to do it, I'll give you five minutes for rebuttal so that you have enough time to hear California's, the warden's arguments, and you or your co-counsel can figure out who wants to give the rebuttal. If for some reason you both want to give a rebuttal, ask me and I'll consider that. But why don't you make a final point and I'll give you five minutes on rebuttal. Oh, okay. So I guess I would do this, urge the court to look at the transcript of that proceeding in which Mr. Clark advised the court that he was going to stand mute and it's hard to see anything in that that looks like disruptive behavior. And there was no inquiry by the court or no action by the court other than I'm standing mute and therefore your proper status is withdrawn. On that basis, we'll turn it over to opposing counsel. All right, thank you. We'll hear from the warden's counsel. Good afternoon, your honors, and may it please the court. I think the court's hypothetical, as the court's questioning indicated, it is this case. Here, unlike most situations where a court has to determine whether a defendant is playing the Faretta game, where the court normally has to rely solely on circumstantial evidence. In this case, we have the direct evidence out of Clark's mouth, both written and oral, that he was trying to create an appeals court nightmare. That was the explicit headline for the California Supreme Court's analysis when it found that Clark could not prevail on the very claims where he was trying to manufacture error. So, of course, that's relevant to the last subject that we were talking about, the stand mute claim. California Supreme Court reasonably found that that was a disingenuous statement made either to inject error into the record or to pressure the previous ruling from the trial court that Clark didn't like, and probably both. Although, I have to say, I think the California Supreme Court may have overread the letter a little bit. I mean, he starts out on the relevant paragraph. Also, I have gone pro per at least three times and have not been denied the right, underlining, he underlined right. I think that's S.E.R. 56. So, he certainly accurately said this is going to create an appeals court nightmare, but I think reading the letter as saying he was doing it as an attack is perhaps over reading the words that he wrote. Well, I think the context immediately above there, he is describing pretty literally a setting and a trap where he refers to walking a line where he has a whole string of attorneys who can't deal with him, and that causes a delay, and he will be ready to assert his speedy trial right if that delay becomes too much, and he's bragging about this. He is. I think that's a fair reading, but in that paragraph, he says, and it violated my rights to a speedy trial. So, I think it's also a narrative of what he believes happened. I don't think that that by itself indicates that this wasn't attack, but again, I think the California Supreme Court may have overread this handwritten letter a little bit. Again, that has to be read in the context of this hearing and the surrounding hearings immediately before he said he would stand mute. He was refusing to move on from a ruling that he didn't like, and when the court asked whether he was ready for the jury to be brought in, he responded, I'm ready for you to actually consider my motion properly, and then he waited until the jury was on. Exactly. This is as he was about to begin cross-examining Dr. Choi. That's when he made the stand mute statement, viewing this in the whole context of the immediate context, and of course, everything leading up, and the fact that he wasn't standing mute. He immediately before then was actively thinking about how he would cross-examine witnesses, and he went back to cross-examining or actively litigating the case himself afterwards. It was disingenuous, and it was reasonable for the California Supreme Court to reach that conclusion, essentially that a stand mute statement, it is just a manipulation. So counsel, let's say hypothetically, we didn't agree with you on the ADPA issue, and we were looking at on the stand argument be as to if we're not going to apply ADPA, how we would get to affirm on the stand mute issue. Well, even without the reasonableness deference of ADPA, the applicable laws is still the same, and the court is dealing with the same record that was before the California Supreme Court, which shows the same history of intentionally trying to manufacture error, and then actively litigate this case until he got a ruling he didn't like, and as with many of the rulings he didn't like, he essentially tried to create an all-or-nothing situation, saying, I quit. And again, this is against the background of him previously urging his lawyer to use the same stand mute tactic when in the face of an unfavorable ruling. And then again, after the stand mute statement, he proceeded to not stand mute. So the context is the same, the court can reach the same conclusion, absent any reasonableness deference. I just don't think state or federal, there's a court in this country where a defendant is getting away with that sort of stunt. It really doesn't depend on ADPA deference. For the August Feretta issue, there were a couple of things I want you to correct factually. Counsel, you're breaking up a little bit. I want to make sure that counsel for Mr. Clark are still there and able to hear you. We are still here and we can hear. Okay. All right. Okay. Thank you. We'll let you know if it gets so that it's breaking up too much. But for now, why don't you keep going? Thank you, Your Honor. For the August Feretta issue, I just wanted to clarify. It sounded like Clark's counsel said that during the August 20th proceedings in Judge Torres' courtroom that Clark eventually said that he would be fine proceeding without any counsel at all. That's not correct. That didn't happen until October when he was actually granted self-representation. That was the first time he ever said that he would accept truly going pro per or pro se and not having any counsel. Also, in his own request, when he was asking for a co-counsel, he was aware that his attorney Watson didn't really want to be his co-counsel, his sole co-counsel. So that wasn't some sort of surprise that retroactively edited his request to make it just a request for no counsel. He was asking for a co-counsel knowing that she didn't want to be his sole co-counsel. And she confirmed that she didn't want to, but she didn't say she was unavailable. This is a court-appointed attorney and she doesn't get to just unilaterally make that call. And I would point out even after she said that, Clark did not say, okay, then I'll take no counsel. I think there's actually a point in the record where on the record, Mr. Clark fired Mr. Keith and the court actually said, well, he's court appointed. So that's not up to you. Exactly. So if the court is honing in on the analysis that the district court did, the de novo analysis for the August Feretta claim, the court still is obligated to apply the Supreme Court's direction that any available inference should be made against finding a waiver of counsel. So the forth that we're talking about, certainly any equivocation isn't in Clark's favor and he would that claim even de novo. However, reasons we've described in our brief, the timeliness ruling that the California Supreme Court made about the August claim, which was the California Supreme Court's only ruling or finding that that was also reasonable because the US Supreme Court has never said whether the timeliness determination should be tied to the expected trial date or the date. And as the California Supreme Court pointed out, what Clark wanted to do at that hearing, eventually he clarified if he was granted self-representation, he wanted to basically completely reopen discovery. So the California Supreme Court noted that would have resulted in an undetermined delay as opposed to coming back next week to continue with the pre-trial motions, which is what actually happened. So these weren't really comparable delays. Well, FRED itself involved, although it's not, didn't directly talk about timeliness. It said that this was made well before trial and then later on, basically it was 14 days before trial. So in our case law, although it's pre-EDPA, has basically said that if as long as the request is made before the jury's impaneled, it's timely. Now, I grant you that the Supreme Court hasn't set any time limits and we have to look at whether the, if we're applying EDPA, whether the Supreme Court, California Supreme Court's decision was objectively unreasonable. But there is a timeliness element that seems to be around 14 days, at least under Ferretta. Although that wasn't the whole thing. I grant you. Right. I think the word that Ferretta used, the opinion used was weeks. And it clarified that under the circumstances of the case, which included circumstances beyond simply the amount of time. And that's why California's Wyndham framework for applying Ferretta is reasonable. And that's what the court was doing when it made that factor analysis under the state law factors. But again, this is about as equivocal a request as you could imagine, because Clark was So as the district court realized, this is a very obvious equivocation. And I would close just by saying that it's been more than 40 years since Clark openly tried to create an appeals court nightmare by manufacturing the issues that are, we're talking about today. That's not what any of these constitutional rights are for. And the court should affirm. All right. Thank you. So for Mr. Clark's counsel, we'll give you five minutes total. And if you want to split it up to discuss both issues, that's fine. But I'll leave that to you. But it's five minutes total. Thank you, Your Honor. I probably won't even take that much. I think we're getting really confused in the record here. I keep hearing remarks that were made prior to and after being applied to various things. I would just like my co-counsel urge this court to see what is going on, how the record goes. The calendar supports our claim. I'll make that. You can't go back and say, oh, he was disruptive two, three weeks ago. Therefore, he's disruptive now. So I mean, that would be all I wish the court to do. Now, with respect to whether he's setting a trap, that to me is very, very odd in that I don't know of any authority that says it's wrong to do that. I've heard criminal defense lawyers boast about doing the very same thing in court. But I mean, if we're going to say that's what he was doing, we need to have at least some idea of why, what it was about. If Clark was disingenuous about standing mute, he certainly didn't want to have Keith represent him. That was the last thing he wanted. And that was clear from the record. The trial court said, unless you drop your stand mute defense and go forward as we have, I'm going to give you back Keith. Okay. That was the Hobson's choice right there. Clark decided rather than have an attorney he despises standing next to him, he would go forward and do the same muddled examination, cross-examination. The record is embarrassing how badly Mr. Clark handled his own defense. But he did it and he went forward. Even though he would rather stand mute. The trial court cannot dictate the type of defense being brought by the defendant. That's what Judge Torres did. So if you're going to stand mute, you're going to get either Keith back, or if you don't want Keith, you got to go forward. You can't put a defendant into that position. My last point is simply about a reference to a Supreme Court directive that all inferences should be made in favor of representation, of no waiver of representation. That comes from the case involving Miranda and interrogation. And of course, that would be the rule in determining whether a waiver of counsel was valid under a police interrogation. It cannot be applied substantially to a situation of a foretta request. That's not how it's supposed to be reviewed, and it's just simply inapplicable. That is all. Thank you. All right. We thank counsel for their arguments, and the case just argued will be submitted. And with that, we are adjourned.
judges: THOMAS, BENNETT, VANDYKE